1

2

3

4

5

6

7

8                          IN THE UNITED STATES DISTRICT COURT

9                         FOR THE EASTERN DISTRICT OF CALIFORNIA

10    KELVIN LAMONTE CHAPMAN,

11                     Petitioner,                    No. CIV S-03-0501 DFL DAD P

12           vs.

13    THOMAS CAREY, Warden, et al.,

14                     Respondents.            FINDINGS & RECOMMENDATIONS

15    _____/

16                 Petitioner is a state prisoner proceeding pro se with an application for a writ of

17    habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges the judgment of conviction

18    entered against him in the Solano County Superior Court on charges of murder with use of a

19    firearm and assault with a firearm.  Petitioner seeks relief on the grounds that: (1) his rights to

20    due process, a fair trial, and an impartial jury were violated when jurors read a newspaper article

21    about his case and when one of the jurors made a disparaging remark about the defense theory

22    and discussed the case with a person not connected with his trial; and (2) jury instruction error

23    violated his right to due process.  Upon careful consideration of the record and the applicable

24    law, the undersigned will recommend that petitioner's application for habeas corpus relief be

25    denied.

26    /////

                                                    1

## PROCEDURAL AND FACTUAL BACKGROUND[1]

Defendant and appellant Kelvin Lamonte Chapman (appellant) was charged with one count of murder (Pen. Code, § 187, subd. (a)) with the use of a firearm (*id.*, §§ 12022.5, subd. (a)(1) & 12022.53, subd. (d)) and three counts of assault with a firearm (*id.*, § 245, subd. (a)(2)) with the use of a firearm (*id.*, §§ 12022.5, subds. (a), (d) & 1192.7, subd. (c)(8)).

A jury found appellant guilty of second degree murder and otherwise as charged and alleged.  The trial court sentenced him to state prison for an indeterminate term of 40 years to life plus a consecutive determinate term of seven years.

\* \* \*

At the trial it was conceded by appellant that: (1) he killed the victim Israel Cervantes by firing two shots into the victim's chest, and (2) he fired additional shots toward the friends of the victim.  The principle defense was reasonable self-defense.

On Sunday, September 26, 1999, the victim played soccer with a group of friends in the afternoon.  After the game was completed, the victim ate dinner in Lee Bell Park with Jose Alfredo Toral Rangel, Jose Santiago-Gutierrez, Justo Gutierrez, Antonio Sanchez Bravo and others of Mexican descent.  Along with dinner, the men each consumed several beers and became intoxicated.  The victim was able to speak and understand English.  Most of the other named men were not conversant in English.  None of the dinner group carried weapons.

Cara Lentz had never met appellant or his friends before September 26, 1999.  On that date Lentz used the park as a shortcut two times during the period the victim was eating and drinking with his friends.  At all material times Lentz was feeling "blurry" from beer and cocaine.  Lentz appeared as a witness for the prosecution and described her two encounters.

On the first occasion she walked alone and was surrounded by seven or eight drunk "Mexican guys," including the victim.  Some of the men asked her in English where she lived and she gave vague answers.  None attempted physical contact.  This walk commenced from the Star Gas station and store.

Some time after safely passing through the park, Lentz ran into appellant with whom she had been friends for about seven years.

---

[1]  The following summary is drawn from the September 28, 2001, opinion by the California Court of Appeal for the First Appellate District (hereinafter Opinion), at pgs. 1-4, lodged on July 18, 2003, as exhibit B to respondents' answer.

Appellant agreed to Lentz's request that he accompany her on her second use of the park as a shortcut. Lentz did not want to walk through the park alone.

A little over one hour after her first walk, Lentz and appellant entered the park. She was carrying a bottle of beer. Almost immediately they met the victim. Lentz was somewhat vague about the exact order of what happened thereafter.

She remembered, however, that she and appellant went over to the table occupied by the victim's group, and everyone chatted peacefully in English. One of the group wanted Lentz's beer and she gave it to him when the bottle was half full. Lentz may have sat on the table drinking her beer and may have passed a cigarette from appellant to one of the group.

After about 10 minutes, Lentz and appellant started to leave. The victim walked with them; one of the victim's group followed behind. Suddenly, the victim became angry and argumentative. Lentz heard several comments. The victim asked why Lentz brought a bodyguard back with her and how much appellant charged for her. Appellant repeatedly asked the victim to "get out of his face" and used the words, "No problemo."

The victim and appellant began to walk away from Lentz and the others. Lentz saw the victim reach his hand into the front of his pants. No weapon was observed in the victim's hands by Lentz. Appellant told Lentz to run and shot the victim from close range. A total of five shots were fired by appellant. Lentz was not sure whether the shots occurred before or after the command to run. Both Lentz and appellant ran out of the park. Lentz had a prior robbery conviction.

Three of the victim's friends who witnessed the final confrontation testified for the prosecution. None of three heard an argument or saw the victim move his hand or reach immediately prior to the shooting. Two of the witnesses observed that the victim stood with his hands "down [¶] . . . [¶] . . . to the sides," or held "normally," at the instant of the shooting. Otherwise, each described the events generally in a similar manner to Lentz. The victim's friends ducked or ran for cover while the final three shots were being fired.

Evidence was presented by the prosecution that the victim's chest was not covered by clothing at the time of the shooting. A shirt may have been draped over his shoulders. There were tattoos on the victim's arm, hand and chest.

Appellant testified in his own behalf. He had two prior felony convictions for possession of cocaine for sale, and knew it was illegal for him to carry a handgun. Nevertheless, he carried a gun for protection from gang members and other violent people.

Appellant was not of Hispanic descent, but he was raised in an area with Mexican gangs. When he was a teenager, about 11 to 15 years prior to the instant shooting, he had been assaulted by members of the "Sureno" Mexican gang.

On the day of the shooting, appellant drank only "two sips of a beer" and ingested no other intoxicant. Appellant was going to purchase cigarettes at the Star Gas station. The events leading to the final confrontation were described in a similar manner to Lentz's testimony. Appellant noticed that he was being surrounded by several persons of Mexican descent who were very intoxicated. Also, the victim had tattoos signifying membership in the Sureno gang.

Shortly before the shooting, the victim became angry, agitated and began "trippin," or "bouncing around, getting in [appellant's] face." In order to calm the victim, appellant uttered the words "no problemo." These words had the opposite effect. The victim became angrier and repeatedly stated that appellant should not talk in Spanish because appellant was not Mexican or a member of a gang.

At the same time, the victim walked closer to appellant with "balled-up" fists. Appellant held up his hands in defense. The victim attempted to knock down appellant's hands. Appellant put his hands down and moved backward. The victim stepped back and reached into his pants as if for a gun. Appellant never saw a gun. When the victim's hand appeared to become caught on the tank top shirt he was wearing, appellant drew his handgun and shot the victim two times in the chest.

Appellant further testified that he pointed his gun directly at the victim from a close range. Appellant did not intend to kill the victim; he "intended to slow [the victim] down." When the shot was fired, appellant believed the victim was about to kill him. This belief was based on the victim's actions and appellant's past history with Mexican gangs.

After the victim was shot, the other members of his group moved toward appellant. To scare them off, appellant fired other shots in their direction into the air. Appellant told Lentz to run and both fled from the park. Later in the evening, appellant threw the gun in a trash bin.

Petitioner filed a timely appeal in the California Court of Appeal for the First Appellate District, in which he claimed that the trial court: (1) improperly refused to give a requested pinpoint jury instruction; (2) improperly instructed the jury that voluntary manslaughter requires an intent to kill; and (3) improperly denied petitioner a hearing on his

4

request for disclosure of juror identification.  (Answer, Ex. H.)  Petitioner's judgment of

conviction was affirmed in its entirety in a reasoned decision dated September 28, 2001.

(Answer, Ex. B.)

On October 29, 2001, petitioner filed a petition for review in the California

Supreme Court, in which he claimed that the trial court: (1) improperly refused to give a

requested pinpoint jury instruction; and (2) improperly instructed the jury that voluntary

manslaughter requires an intent to kill.  (Answer, Ex. C.)  That petition was summarily denied by

order dated December 12, 2001.  (Answer, Ex. D.)

On August 27, 2002, petitioner filed a petition for writ of habeas corpus in the

California Supreme Court, in which he claimed that: (1) the trial court improperly refused to give

a requested pinpoint jury instruction; (2) the trial court improperly instructed the jury that

voluntary manslaughter requires an intent to kill; and (3) several of the jurors at his trial engaged

in misconduct when they read a newspaper article about the case and discussed the case with a

person not connected with the trial.  (Answer, Ex. E.)  The California Supreme Court denied that

petition by order dated February 6, 2003, with a citation to In re Waltreus, 62 Cal. 2d 218 (1965).

Petitioner's federal petition for writ of habeas corpus was filed on March 12, 2003.

ANALYSIS

I.  Standards of Review Applicable to Habeas Corpus Claims

A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of

some transgression of federal law binding on the state courts.  See Peltier v. Wright, 15 F.3d 860,

861 (9th Cir. 1993); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v.

Isaac, 456 U.S. 107, 119 (1982)).  A federal writ is not available for alleged error in the

interpretation or application of state law.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991);

Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000); Middleton, 768 F.2d at 1085.  Habeas

corpus cannot be utilized to try state issues de novo.  Milton v. Wainwright, 407 U.S. 371, 377

(1972).

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  See Lindh v.Murphy, 521 U.S. 320, 336 (1997); Clark v. Murphy, 331 F.3d 1062, 1067 (9th Cir. 2003).  Section 2254(d) sets forth the following standards for granting habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  See also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Williams v. Taylor, 529 U.S. 362 (2000); Lockhart v. Terhune, 250 F.3d 1223, 1229 (9th Cir. 2001).

The court looks to the last reasoned state court decision as the basis for the state court judgment.  Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under section 2254(d).  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).  When it is clear that a state court has not reached the merits of a petitioner's claim, or has denied the claim on procedural grounds, the AEDPA's deferential standard does not apply and a federal habeas court must review the claim de novo.  Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003); Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

/////

/////

/////

II.  <u>Petitioner's Claims</u>

    A.  <u>Juror Misconduct</u>

        Petitioner's first claim is that his rights to due process, an impartial jury, and a fair trial were violated when the trial court failed to declare a mistrial or to conduct an evidentiary hearing after receiving information that some of the jurors had read a newspaper article about the case and that one juror made disparaging remarks about petitioner's defense theory and discussed the case with a person who was not associated with petitioner's trial.  Respondents argues that the procedural default doctrine bars federal review of this claim.  The factual background to this claim will be set forth below.

        On appeal in state court, petitioner argued, among other things, that the trial court abused its discretion when it denied petitioner's request for disclosure of the addresses and telephone numbers of his jurors to enable him to investigate a claim of juror misconduct raised in his motion for a new trial.  (Answer, Ex. B at 8.)  The California Court of Appeal rejected this claim on the merits.  (<u>Id.</u> at 8-12.)  On October 29, 2001, petitioner filed a petition for review in the California Supreme Court, in which he raised the same claim.  (Answer, Ex. C.)  That petition was summarily denied by order dated December 12, 2001.  (Answer, Ex. D.)  Petitioner then filed a petition for writ of habeas corpus in the California Supreme Court, in which he claimed for the first time that jury misconduct violated his rights to due process, a fair trial, and an impartial jury.  (Answer, Ex. E.)  As set forth above, that petition was denied with a citation to <u>In re Waltreus</u>.  (Answer, Ex. F.)  Respondents argue that the Supreme Court's citation to <u>Waltreus</u> constitutes a procedural bar precluding this court from considering the merits of petitioner's claim of juror misconduct.  (Answer at 5-6.)  Specifically, respondents contend that petitioner's claim of juror misconduct is barred because of petitioner's failure to present the claim in his petition for review in the California Supreme Court.

        State courts may decline to review a claim based on a procedural default.  <u>Wainwright v. Sykes</u>, 433 U.S. 72 (1977).  As a general rule, a federal habeas court "'will not

1  review a question of federal law decided by a state court if the decision of that court rests on a

2  state law ground that is independent of the federal question and adequate to support the

3  judgment.'" Calderon v. United States District Court (Bean), 96 F.3d 1126, 1129 (9th Cir. 1996)

4  (quoting Coleman v. Thompson, 501 U.S. 722, 729 (1991)).  The state rule is only "adequate" if

5  it is "firmly established and regularly followed." Id. (quoting Ford v. Georgia, 498 U.S. 411,

6  424 (1991)). See also Bennett v. Mueller, 322 F.3d 573, 583 (9th Cir. 2003) ("[t]o be deemed

7  adequate, the state law ground for decision must be well-established and consistently applied.")

8  The state rule must also be "independent" in that it is not "interwoven with the federal law."

9  Park v. California, 202 F.3d 1146, 1152 (9th Cir. 2000) (quoting Michigan v. Long, 463 U.S.

10  1032, 1040-41 (1983)).  Even if the state rule is independent and adequate, the claims may be

11  heard if the petitioner can show:  (1) cause for the default and actual prejudice as a result of the

12  alleged violation of federal law; or (2) that failure to consider the claims will result in a

13  fundamental miscarriage of justice.  Coleman, 501 U.S. at 749-50.

14      In re Waltreus, the case cited by the California Supreme Court in its decision

15  rejecting petitioner's claim of juror misconduct, holds that "habeas corpus ordinarily cannot

16  serve as a second appeal."  62 Cal. 2d at 225.  Clearly, the relitigation rule announced in

17  Waltreus does not bar federal habeas review.  Ylst v. Nunnemaker, 501 U.S. 797, 806 (1991);

18  Hill v. Roe, 321 F.3d 787, 789 (9th Cir. 2003) ("[T]he United States Supreme Court held that an

19  In re Waltreus citation is neither a ruling on the merits nor a denial on procedural grounds and,

20  therefore, has no bearing on a California prisoner's ability to raise a federal constitutional claim

21  in federal court."); LaCrosse v. Kernan, 244 F.3d 702, 705 (9th Cir. 2001); Calderon, 96 F.3d at

22  1131.  Therefore, the California Supreme Court's citation to Waltreus does not bar federal review

23  of petitioner's claim of jury misconduct.  Accordingly, the court will address this claim on the

24  merits.

25      The background to petitioner's claim of juror misconduct was described by the

26  California Court of Appeal as follows:

8

In the instant case, appellant requested a court order for disclosure of a list of the telephone numbers and addresses of the jurors on the ground that: "Good cause exists for the disclosure of the requested information as set forth in [appellant's] Motion for a New Trial . . . ."  Appellant's motion for a new trial alleged that the jury engaged in misconduct by discussing newspaper articles about the trial and when "one of the jurors basically told the other jurors that the defense of self[-]defense was a joke."

At the outset of trial the judge instructed: "You must not read or listen to any accounts or discussions of the case reported by the newspapers or other news media."  Appellant submitted the declarations of two jurors in support of his motion.

Alternate juror No. 1 averred as follows.  All the jurors read a newspaper every day.  On Friday, May 19, 2000, just before appellant testified, several jurors were seated in the jury room.  Juror No. 7 was reading a newspaper and showed an article about the case "to more than two people, everybody looked at it."  A female juror indicated she had seen the article.  Another juror stated "it was alright to read the newspaper . . . ."  Juror No. 7 commented that he was using his neighbor's newspaper while the neighbor was on vacation.  "[A]fter he made that statement, Juror number 7 said, 'if you murder somebody you use self-defense to get off[,'] and then hit the table with his hands like ba da bump, like a joke."  Juror No. 7 pointed out that the Star Gas station was visible from the jury room window.

Juror No. 7 averred as follows.  "I don't think that I made any statements about self[-]defense before the defendant testified."  Regarding May 19, 2000, "several jurors" were reading a newspaper and were showing an article about the case to "other jurors."  One of the jurors stated that it was all right to read the newspaper.  Juror No. 7 did not think that he read the article about the case and was "not certain" whether other jurors read it.  It was "hard to miss a headline on the front page" and many jurors discussed that there was an article in the newspaper about the case.  The "specifics" of the article were not discussed.  While the jurors were walking to lunch, one pointed out that the Star Gas station could be seen from their destination.

In opposition to the motion to disclose, the prosecution submitted a declaration by alternate juror No. 2 which averred as follows.  The judge instructed "to the effect that reading the newspaper was permissible but **not** to read any articles about the trial . . . ."  "[T]here was general acknowledgement among the jurors that it was not permissible to read newspaper articles about the trial."  One juror stated it was "all right" to read parts of a newspaper not about the trial."  Alternate juror No. 2 never read about the trial and no juror acknowledged doing so in his presence.  No juror

1    expressed any opinion concerning the guilt or innocence of
     appellant.
2
     On May 19, 2000, alternate juror No. 2 was reading a newspaper as
3    he did every day during breaks in the trial.  One juror mentioned
     that the newspaper contained a story about the trial which alternate
4    juror No. 2 should avoid.  Juror No. 2 acknowledged the existence
     of the article but did not state that she read it.
5
     The trial court's reasons for denying disclosure were: "I've
6    reviewed all the submissions on this issue, and I don't find
     sufficient evidence to support a claim that the jury misconduct
7    occurred.  There's no supporting declarations which tell us that the
     jury misconduct happened.  And I'm not willing to take the leap
8    that a juror will sign a declaration that they didn't do something,
     with this jaundiced view that you can't really believe them when
9    they tell you that, Judge, because, number one, the declaration was
     signed, I believe, under penalty of perjury, and the juror was being
10   very specific as to what they said . . . .  And if memory serves, an
     additional point is . . . that the Court gave an admonition not to
11   read newspapers about the trial, and I believe in that declaration,
     the juror said they didn't."
12

13   (Opinion at 10-11.)  (See also Ex. G to Answer at 537; Ex. A to Answer at 155-68, 170-74, 198-

14   204.)

15        The California Court of Appeal concluded that the trial court properly denied

16   petitioner's request for disclosure of juror information.  The appellate court reasoned as follows:

17        Based on the statute, cases and declarations, we conclude that the
          trial court did not abuse its discretion in finding that appellant
18        failed to make the required showing of jury misconduct.  The trial
          court could properly accept the declarations averring that no
19        remarks were made about self-defense.  At most a joking comment
          was uttered.  No declaration indicates that any juror disobeyed the
20        admonition and read the article about the trial.  The Star Gas
          station was only marginally involved with the case.
21

22   (Opinion at 12.)

23        In the instant petition, petitioner claims that the jury in his case engaged in

24   misconduct when at least some of the jurors read a newspaper article about his case and when

25   juror No. 7 made disparaging remarks about petitioner's claim of self-defense.  (Pet. at

26   consecutive p. 5.)  Petitioner also claims that the jury committed misconduct when, "during the

1  trial and deliberations," one of the jurors had a conversation about his case with the former police

2  chief for the city of Vacaville.  (Id.)  This court will evaluate these claims in turn below.

3            1. Newspaper Article

4            The Sixth Amendment right to a jury trial "guarantees to the criminally accused a

5  fair trial by a panel of impartial, 'indifferent' jurors."  Irvin v. Dowd, 366 U.S. 717, 722 (1961).

6  Due process requires that the defendant be tried by "a jury capable and willing to decide the case

7  solely on the evidence before it."  Smith v. Phillips, 455 U.S. 209, 217 (1982).  When the jury

8  breaches this duty by considering extraneous facts not introduced in evidence a defendant has

9  effectively lost the rights of confrontation, cross-examination, and the assistance of counsel with

10  regard to jury consideration of the extraneous evidence.  Hughes v. Borg, 898 F.2d 695, 699 (9th

11  Cir. 1990).  However, "the extent, if at all, to which the jurors saw or discussed the extrinsic

12  evidence," is a question of historical fact as to which the state court's findings are entitled to a

13  presumption of correctness.  Dickson v. Sullivan, 849 F.2d 403, 406 (9th Cir. 1988).  See also 28

14  U.S.C. § 2254(e).

15            Here, the California Court of Appeal reviewed the record and affirmed the trial

16  court's finding that the members of the jury did not read any news articles about petitioner's case.

17  Petitioner has offered no evidence that this finding was erroneous and it is therefore presumed

18  correct.  28 U.S.C. § 2254(e).  The finding is also supported by the state court record.[2]  As

19  observed by the trial court, petitioner was not entitled to additional juror information based on

20  mere speculation that some of the jurors may have disregarded the court's explicit instructions

21  and read news articles about petitioner's case.  Because this court is bound by the state courts'

22

23            [2] In this regard, the state court record reflects that one of the jurors signed a declaration in
support of the prosecutor's opposition to petitioner's motion for new trial, in which the juror

24  stated that: (1) "there was general acknowledgment among the jurors that it was not permissible
to read newspaper articles about the trial;" (2) to his knowledge no juror read a newspaper article

25  about petitioner's trial; (3) he was specifically advised by another juror to avoid an article in the
paper about the trial; and (4) although one juror stated it was "all right to read the newspaper

26  because this is not the O.J. trial," she was referring to "reading the newspaper in general, and not
to reading any articles in the paper about the trial."  (Answer, Ex. A at 192.)

1  finding that the jury did not receive any prejudicial extrinsic information, there was no

2  constitutional error at petitioner's trial.

3        Even assuming arguendo that some of the jurors read the news articles filed as

4  exhibits to petitioner's state court motion for a new trial, the error was not prejudicial.  It is

5  clearly established federal law that prejudicial extraneous influences on a jury constitutes

6  misconduct which may result in the reversal of a conviction.  Parker v. Gladden, 385 U.S. 363

7  (1966) (bailiff's prejudicial comments warranted reversal).  However, petitioner bears the burden

8  of establishing that a juror's consideration of extrinsic material had a "substantial and injurious

9  effect or influence in determining the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 637

10 (1993); Rodriguez v. Marshall, 125 F.3d 739, 745 (9th Cir. 1997); Lawson v. Borg, 60 F.3d 608,

11 613 (9th Cir. 1995); Dickson, 849 F.2d at 405.  See also Rushen v. Spain, 464 U.S. 114, 115-19

12 & n.3 (1983) (affirming state court's determination that a juror's ex parte communication was

13 harmless beyond a reasonable doubt); Thompson v. Borg, 74 F.3d 1571, 1576 (9th Cir. 1996)

14 (applying "harmless-error" standard when a veniremember stated during voir dire that he had

15 read in a newspaper that the defendant had "pleaded guilty at one time and changed it").  Cf.

16 Caliendo v. Warden of California Men's Colony, 365 F.3d 691, 695-98 (9th Cir. 2004)

17 (recognizing that United States Supreme Court jurisprudence requires courts to presume

18 prejudice in cases involving unauthorized contact between a juror and a witness or an interested

19 party).

20        In Lawson v. Borg, the Ninth Circuit explained the legal standard to be applied in

21 considering such a claim to habeas relief as follows:

22        Jury exposure to facts not in evidence deprives a defendant of the
           rights to confrontation, cross-examination and assistance of

23        counsel embodied in the Sixth Amendment.  However, a petitioner
           is entitled to habeas relief only if it can be established that the

24        constitutional error had "substantial and injurious effect or
           influence in determining the jury's verdict."  Whether the

25        constitutional error was harmless is not a factual determination
           entitled to the statutory presumption of correctness under 28 U.S.C.

26        § 2254(d). . .

> Several factors are relevant to determining whether the alleged
> introduction of extrinsic evidence constitutes reversible error:
> (1) whether the extrinsic material was actually received, and if so,
> how; (2) the length of time it was available to the jury; (3) the
> extent to which the jury discussed and considered it; (4) whether
> the material was introduced before a verdict was reached, and if so,
> at what point in the deliberations it was introduced; and (5) any
> other matters which may bear on the issue of ⋯ whether the
> introduction of extrinsic material [substantially and injuriously]
> affected the verdict.  When assessing prejudice claims in juror
> misconduct cases, this court also places great weight on the nature
> of the extrinsic evidence introduced.

60 F.3d at 612 (Internal citations omitted).

After a review of the record, this court concludes that the newspaper articles to which the jurors may have been exposed in this case contained no information that was unduly prejudicial.  (See Answer, Ex. A at 176-78, 194.)  Petitioner has failed to demonstrate that the articles contained any information that differed in any material respect from the evidence introduced at trial.  (Id.)  Moreover, there has been no showing suggesting that the content of the articles, which are mere factual reports of testimony given and arguments made before the jury, had a "substantial and injurious effect or influence in determining the jury's verdict."  Brecht, 507 U.S. at 637.

Petitioner argues that the trial court erred in failing to conduct an evidentiary hearing to determine whether, and to what extent, any juror misconduct occurred.  (Pet. at consecutive p. 7.)  "Clearly established federal law, as determined by the Supreme Court, does not require state or federal courts to hold a hearing every time a claim of juror bias is raised."  Tracey v. Palmateer, 341 F.3d 1037, 1045 (9th Cir. 2003), cert. denied, 543 U.S. 864 (2004).  Thus, this court cannot find that the trial judge's refusal to hold an evidentiary hearing at which he would question any or all of the jurors was contrary to or an unreasonable application of clearly established federal law.  In any event, an evidentiary hearing was unnecessary in this case.  The trial judge knew the exact scope, contents and nature of the newspaper articles and he had before him juror affidavits supporting the conclusion that no juror had even read the contents of

1   the articles.  See Burks v. Borg,  27 F.3d 1424, 1432 (9th Cir. 1994) (habeas court bound by state

2   courts' finding that juror either was not exposed to or had no recollection of extraneous

3   prejudicial information).  Cf. United States v. Bagnariol, 665 F.2d 877, 885 (9th Cir. 1981) (trial

4   court, upon learning of a possible incident of juror misconduct that could have affected the

5   verdict, must hold an evidentiary hearing to determine the precise nature of the extraneous

6   information).  Under the circumstances of this case, an evidentiary hearing was not required.

7        Accordingly, for all of these reasons, petitioner is not entitled to relief on his

8   claim that the jury committed misconduct when it read news articles about his case.

9                    2.  Conversation Between Juror and Former Police Chief

10       Petitioner also argues that the trial court erred when it failed to declare a mistrial

11  after receiving information that one of the jurors had a conversation about petitioner's case with a

12  person unconnected with the trial.  In support of this claim, petitioner has filed the declaration of

13  Gary Tatum, former Chief of Police for the city of Vacaville, who declares that "the day after the

14  jury reached its verdict," he engaged in a conversation initiated by Jay Yerkes, a juror at

15  petitioner's trial.  (Pet., Appendix A, last exhibit.)[3]  Mr. Tatum declares that he "did not talk to

16  Yerkes regarding the particulars of the case only the decision that was made by Yerkes and the

17  jury."  (Id.)  During their conversation, Mr. Yerkes informed Mr. Tatum that "there was a lot of

18  uncertainty as to the defendant's guilt."  (Id.)  According to the declaration of Mr. Tatum, his

19  conversation with Mr. Yerkes took place after the jury had already reached its verdict.

20       As indicated above, on habeas the petitioner bears the burden of establishing that

21  extrinsic evidence had a substantial and injurious effect on the jury's verdict.  Rodriguez, 125

22  F.3d at 745; Lawson, 60 F.3d at 613.  Mr. Tatum's declaration obviously does not assist

23  petitioner in meeting this burden since it pertains only to a juror's conversation with Tatum

24

25       [3] This declaration was also filed in state court in support of the prosecutor's supplemental
    opposition to petitioner's request for an order disclosing juror information.  (Answer, Ex. A at
26  222, 226-27.)

1   which took place <u>after</u> the verdict was reached and does not involve the jury's consideration of

2   extrinsic material in any event.  There is no misconduct or bias evidenced by Mr. Tatum's

3   declaration that would entitle petitioner to relief.[4]

4                    3.  <u>Juror's Remarks about Petitioner's Defense</u>

5                    Petitioner argues that juror No. 7 committed misconduct when he made

6   disparaging remarks about petitioner's claim of self-defense in front of the other jurors.  In this

7   regard and as described above, in one post-trial affidavit an alternate juror stated that on the

8   Friday before the verdict was returned juror No. 7 made a statement and a gesture which could be

9   construed as being derogatory toward a claim of self-defense in a murder trial.  (<u>See</u> Answer, Ex.

10  A at 174.)

11                   It is true that a juror may be objected to for bias if they have formed such deep and

12  strong impressions that they will not listen to testimony with an open mind.  <u>Irvin</u>, 366 U.S. at

13  722 n.3.  However, the state court found that the trial court could have properly (1) credited the

14  juror declarations indicating that no statement was made regarding self-defense before the

15  defendant testified and (2) found any remarks made by juror No. 7 in this regard were only in

16  jest.  This finding is presumed correct.  28 U.S.C. § 2254(e).  Moreover, the alleged statement

17  attributed to juror No. 7 does not provide credible, significant evidence that juror No. 7 harbored

18  impermissible bias against petitioner or his defense of self-defense, had made up his mind or

19  would not base the verdict on the evidence.  <u>See</u> <u>United States v. Hursh</u>, 217 F.3d 761, 769 (9th

20  Cir. 2000).  To the extent the juror in question made the alleged comment after the defendant's

21

22           [4]  To the extent Mr. Tatum's declaration may suggest that the juror he spoke to after the
     verdict harbored some remaining doubt as to petitioner's guilt, it does not provide the basis for
23   habeas relief.  Statements regarding matters that are internal to the jury process are not
     admissible to impeach a jury verdict.  Fed. R. Evid. 606(b).  <u>See</u> also <u>Tanner v. United States</u>,
24   483 U.S. 107, 127 (1987) ("[L]ong-recognized and very substantial concerns support the
     protection of jury deliberations from intrusive inquiry."); <u>Belmontes v. Brown</u>, 414 F.3d 1094,
25   1124 (9th Cir. 2005) (habeas petitioner not entitled to relief on claim that the jury based its
     penalty decision on the view that life without parole did not necessarily mean life in prison
26   because this "concerns intrinsic jury processes"); <u>Sassounian v. Roe</u>, 230 F.3d 1097 1108-09 (9th
     Cir. 2000); <u>Hard v. Burlington Northern R. Co.</u>, 870 F.2d 1454, 1460 (9th Cir. 1989).

testimony, it is likely that any preliminary opinion he might have formed was based on the evidence introduced at trial.  Id.  Finally, to the extent the alleged comment and gesture was made during deliberations, the declarations of other jurors are not admissible.  See fn. 4,  infra.

Accordingly, petitioner's claims of juror bias and/or misconduct should be rejected.

B.  Jury Instructions

Petitioner raises several claims of jury instruction error.  After setting forth the applicable legal standards, the court will evaluate these claims in turn below.

1.  Legal Standards

In general, a challenge to jury instructions does not state a federal constitutional claim.  See Middleton, 768 F.2d at 1085 (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983).  In order to warrant federal habeas relief, a challenged jury instruction "cannot be merely 'undesirable, erroneous, or even "universally condemned,"' but must violate some due process right guaranteed by the fourteenth amendment."  Prantil v. California, 843 F.2d 314, 317 (9th Cir. 1988) (quoting Cupp v. Naughten, 414 U.S. 141, 146 (1973)).  To prevail on such a claim petitioner must demonstrate "that an erroneous instruction 'so infected the entire trial that the resulting conviction violates due process.'"  Prantil, 843 F.2d at 317 (quoting Darnell v. Swinney, 823 F.2d 299, 301 (9th Cir. 1987)).  In making its determination, this court must evaluate the challenged jury instructions "'in the context of the overall charge to the jury as a component of the entire trial process.'"  Id. (quoting Bashor v. Risley, 730 F.2d 1228, 1239 (9th Cir. 1984)).  Further, in reviewing an allegedly ambiguous instruction, the court "must inquire 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution."  Estelle, 502 U.S. at 72 (quoting Boyde v. California, 494 U.S. 370, 380 (1990)).

/////

/////

2. <u>Jury Instruction on Self-Defense</u>

Petitioner claims that his right to due process was violated when the trial court refused a defense request for a pinpoint jury instruction on self-defense. The California Court of Appeal fairly summarized the background to this claim as follows:

> The jury was instructed with CALJIC No. 5.15: "Upon a trial of a charge of murder, a killing is lawful, if it was justifiable. The burden is on the prosecution to prove beyond a reasonable doubt that the homicide was unlawful, that is, not justifiable. If you have a reasonable doubt that the homicide was unlawful, you must find the defendant not guilty." Appellant requested that the following language be added to CALJIC No. 5.15: "It is not necessary for the defendant to establish self-defense by evidence sufficient to satisfy the jury that the self-defense was true, but if the evidence is sufficient to raise a reasonable doubt as to whether the defendant was justified, then [he] [she] is entitled to an acquittal." The request was denied.

> Other instructions given to the jury relating to the subjects of reasonable doubt, burden of proof and self-defense were: CALJIC No. 5.13 defining self-defense and advising that "[h]omicide is justifiable and not unlawful when committed by any person in the defense of himself . . . ;" CALJIC No. 1.01 – instructions to be considered as a whole; CALJIC No. 2.90 – presumption of innocence-reasonable doubt-burden of proof.

> The jury was also instructed with CALJIC No. 2.01 regarding circumstantial evidence, which states in pertinent part: "[E]ach fact which is essential to complete a set of circumstances necessary to establish the defendant's guilt must be proved beyond a reasonable doubt. In other words, before an inference essential to establish guilt may be found to have been proved beyond a reasonable doubt, each fact or circumstance on which the inference necessarily rests must be proved beyond a reasonable doubt."

(Opinion at 4-5.)

The state appellate court rejected petitioner's claim of jury instruction error, finding that the substance of petitioner's requested pinpoint instruction was adequately covered by the other instructions given at his trial. The appellate court explained its reasoning as follows:

> In the instant case, CALJIC No. 2.01 emphasizes that each fact or circumstance leading to a conclusion that appellant did not act in self-defense must be proved beyond a reasonable doubt. CALJIC No. 5.15 pinpoints that the "prosecution has the burden of proving

/////

17

1    beyond a reasonable doubt that the elements [of self-defense] are
     *not* present."  (People v. Pineiro (1982) 129 Cal.App.3d 915, 921.)

2

3    As a unit, CALJIC Nos. 2.01 and 5.15 and the other instructions
     given unambiguously advised the jury that: (1) the prosecution had
     the burden of proving appellant did not kill the victim in self-

4    defense; (2) appellant was not required to prove anything; and (3)
     if the jury had a reasonable doubt as to whether appellant acted in

5    self-defense, it must acquit.  Accordingly, the substance of the
     pinpoint instruction requested by appellant was covered completely

6    by the other instructions and no federal or state error occurred.

7    (Id. at 5-6.)

8         Petitioner has failed to establish that the omission of his requested pinpoint jury

9    instruction rendered his trial fundamentally unfair or prevented him from presenting an adequate

10   defense of self-defense.  As explained by the California Court of Appeal, the jury instructions

11   given at petitioner's trial, when read as a whole, adequately described the defense of self-defense

12   and informed the jurors that the prosecutor had the burden to prove beyond a reasonable doubt

13   that petitioner's actions were not in self-defense.  The trial court's failure to give another jury

14   instruction which essentially repeated the substance of these jury instructions did not result in a

15   due process violation, nor did it result in prejudice to the petitioner by "ha[ving] a substantial and

16   injurious effect or influence in determining the jury's verdict."  Brecht, 507 U.S. at 637.  This

17   court also notes that petitioner's counsel argued in his closing argument to the jury that the

18   prosecution had the burden to prove beyond a reasonable doubt that the shooting was not in self-

19   defense and "they have failed that burden of proof."  (Answer, Ex. G at 455.)  These remarks

20   reminded the jury, once again, that the prosecutor had the burden of proof on this issue.

21        The decision of the state appellate court rejecting petitioner's claim of jury

22   instruction error is not an unreasonable application of the federal due process principles set forth

23   above.  Accordingly, petitioner is not entitled to relief on this claim.

24   /////

25   /////

26   /////

18

### 3. Jury Instruction on Voluntary Manslaughter

Petitioner claims that his right to due process was violated by a jury instruction that "voluntary manslaughter requires an intent to kill." (Pet., ground 3.) The California Court of Appeal fairly described the background to this claim as follows:

> In addition to the instructions mentioned above, the jury was instructed on second degree murder and voluntary manslaughter from an unreasonable belief in necessity to defend or in the heat of reasonably provoked passion. At the time the jury was instructed, the standard instruction included language that intent to kill was an element of voluntary manslaughter. (Former CALJIC No. 8.40 (6th ed. 1996).) The trial court did not instruct on involuntary manslaughter or give CALJIC No. 8.72 – if reasonable doubt whether murder or manslaughter, verdict should be for manslaughter.
>
> Trial courts have a sua sponte duty to instruct the jury with CALJIC No. 8.72. (People v. Aikin (1971) 19 Cal.App.3d 685, 703, disapproved on other grounds in People v. Lines (1975) 13 Cal.3d 500, 514.)
>
> On June 2, 2000, approximately 10 days after the jury was instructed, the California Supreme Court decided People v. Blakeley (2000) 23 Cal.4th 82 (Blakeley) and People v. Lasko (2000) 23 Cal.4th 101 (Lasko). The holdings of both cases were summarized in Blakeley: "In the companion case of [Lasko], we hold that a defendant who, with conscious disregard for life and the knowledge that such conduct endangers the life of another, unintentionally but unlawfully kills in a sudden quarrel or the heat of passion is guilty only of voluntary manslaughter rather than murder. Here [Blakeley], we hold in a case of first impression that voluntary manslaughter is also committed when a defendant, acting with conscious disregard for life and the knowledge that conduct is life-endangering, unintentionally but unlawfully kills while having an unreasonable but good faith belief in the need to act in self-defense." (Blakeley, at p. 85) Voluntary manslaughter can be committed without the intent to kill. (Ibid.)
>
> In both Blakeley and Lasko, the Supreme Court declared that it was only clarifying, not changing the law. (Blakeley, supra, 23 Cal.4th at pp. 89-91; Lasko supra, 23 Cal.4th at p. 110.) Therefore, the rule that voluntary manslaughter can be committed without the intent to kill can be applied retroactively (People v. Welch (1993) 5 Cal.4th 228, 237-238), unless it operates to the disadvantage of appellant (Weaver v. Graham (1981) 450 U.S. 24, 28-29). The rule was not applied retroactively in Blakeley because the defendant therein was convicted of voluntary manslaughter and the rule worked to his disadvantage. (Blakeley, supra, 23 Cal.4th at

19

pp. 91-93.)  The rule was applied retroactively in <u>Lasko</u>, where the
defendant was convicted of second degree murder, and the giving
of the former instruction that intent to kill was a requirement for
voluntary manslaughter was found to be harmless error.  (<u>Lasko</u>,
<u>suprs</u>, 23 Cal.4th at pp. 111-112.)

In the instant case we apply the rule of <u>Lasko</u> and <u>Blakeley</u>, since
appellant was convicted of second degree murder.  <u>People v.</u>
<u>Crowe</u> (2001) 87 Cal.App.4th 86, 96-97 (<u>Crowe</u>) summarized
<u>Lasko's</u> holding regarding prejudice as follows: "The <u>Lasko</u> court
found no prejudice for three reasons . . . . [¶]  The first reason is that
the jury was instructed pursuant to CALJIC No. 8.50 which
distinguishes murder and manslaughter. . . . . [¶]  The second reason
is that the parties did not prominently argue the theory of voluntary
manslaughter . . . . [¶]  The third reason is that the evidence in this
case strongly suggests an intent to kill."

When such three reasons are present the error is harmless under
state law, and no federal right is impugned because "it is not
reasonably probable a properly instructed jury would have
convicted defendant of the lesser offense of voluntary
manslaughter. [Citation.]" (<u>Crowe</u>, <u>supra</u> 87 Cal.App.4th at p. 97 &
fn. 9; <u>Lasko</u>, <u>supra</u>, 23 Cal.4th at pp. 111, 113.)

(Opinion at 6-7.)[5]

The state appellate court concluded that the jury instruction error in this case was

harmless, reasoning as follows:

In the instant case, CALJIC No. 8.50 was given and so the jury was
informed: "To establish that a killing is murder and not
manslaughter, the burden is on the People to prove beyond a
reasonable doubt each of the elements of murder and that the act
which caused the death was not done in the heat of passion or upon
a sudden quarrel or in the actual, even though unreasonable, belief
in the necessity to defend against imminent peril to life or great
bodily injury." Thus, intent or lack of intent was not the crucial
factor distinguishing manslaughter from murder. (<u>Crowe</u>, <u>supra</u>,
87 Cal.App.4th at p. 96.)

---

[5]  The Ninth Circuit Court of Appeals has also held that voluntary manslaughter can be
committed without an intent to kill.  In discussing the federal voluntary manslaughter statute, the
language of which is identical to California's voluntary manslaughter statute, the Ninth Circuit
noted: "While most voluntary manslaughter cases involve intent to kill, it is possible that a
defendant who killed unintentionally but recklessly with extreme disregard for human life may
have acted in the heat of passion with adequate provocation. [Citations.]  In such a case, the
defendant would be guilty of voluntary manslaughter, not murder." <u>United States v. Paul</u>, 37
F.3d 496, 499, n.1 (9th Cir. 1994).

1

2

3

4

5

> Voluntary manslaughter was not prominently argued herein. The prosecutor urged the jury to convict appellant of second degree murder based on an intentional killing. Defense counsel primarily argued that appellant was not guilty of any crime because he acted in reasonable self-defense. The victim acted aggressively, appeared to be reaching for a gun and was a member of a gang that used violence. Manslaughter was only marginally mentioned by either side. Thus, the incorrect manslaughter instruction was not a crucial part of the case as presented to the jury by the parties.

6

7

8

9

10

> Finally, the evidence in this case strongly suggests an intent to kill, despite appellant's testimony to the contrary. Appellant admitted that he deliberately shot the victim from close range with the intent to "slow him down." Two shots hit the victim in the chest. Appellant called to Lentz and both fled. Moreover, appellant immediately disposed of the murder weapon. (See Crowe, supra, 87 Cal.App.4th at p. 97.) Thus, the jury was not confused into rejecting manslaughter on the basis of the incorrect instruction that it was exclusively an intentional crime.

11

12

> Accordingly, all three factors mentioned by Lasko and Crowe are present and the error in instructions was harmless. For the same reasons, the failure to instruct with CALJIC No. 8.72 is harmless.

13   (Id. at 8.)

14          The state appellate court thus rejected petitioner's claim in this regard on the

15   grounds that the trial court's instructional error was harmless. In order to grant habeas relief

16   where a state court has determined that a constitutional error was harmless, a reviewing court

17   must determine: (1) that the state court's decision was "contrary to" or an "unreasonable

18   application" of Supreme Court harmless error precedent, and (2) that the petitioner suffered

19   prejudice under Brecht from the constitutional error. Inthavong v. LaMarque, 420 F.3d 1055,

20   1059 (9th Cir. 2005). Both of these tests must be satisfied before relief can be granted. Id. at

21   1061.

22          The California Court of Appeal's finding of harmless error was based on three

23   factors: petitioner's jury was correctly instructed on the difference between murder and

24   manslaughter; the parties did not prominently argue to the jury the theory of voluntary

25   manslaughter; and the evidence in the case strongly suggested that petitioner harbored an intent

26   to kill. None of these conclusions is unreasonable. Petitioner's jury was instructed with CALJIC

No. 8.50, which informed the jury that "to establish that a killing is murder and not

manslaughter, the burden is on the People to prove beyond a reasonable doubt each of the

elements of murder and that the act which caused the death was not done in the heat of passion or

upon a sudden quarrel or in the actual, even though unreasonable, belief in the necessity to

defend against imminent peril to life or great bodily injury." (Answer, Ex. A at 128.)  Thus, as

explained by the California Supreme Court in Lasko,

> the jury was told that regardless of whether the killing of [the
> victim] was intentional or unintentional, defendant could not be
> convicted of murder unless the prosecution proved that, at the time
> of the killing, defendant was not acting in the heat of passion. Had
> the jury believed that defendant unintentionally killed [the victim]
> in the heat of passion, it would have concluded that it could not
> convict defendant of murder (because he killed in the heat of
> passion) and could not convict defendant of voluntary
> manslaughter (because he lacked the intent to kill).

Lasko, 23 Cal. 4th at 112.  In this case, petitioner's jury convicted him of second degree murder,

demonstrating that it did not believe the killing was committed in self-defense.  Therefore,

whether petitioner actually harbored the intent to kill was not the dispositive factor distinguishing

murder from manslaughter in this case.

　　　　Second, as described by the California Court of Appeal, the defense did not base

its case on a theory of voluntary manslaughter.  Although defense counsel argued that the

evidence could justify a finding of voluntary manslaughter, (Answer, Ex. G at 456, 472), the

main thrust of the defense case was that petitioner was not guilty of any crime at all because he

shot the victim in self-defense.  (Id. at 455-57, 464-66, 468-72, 473, 477.)  For purposes of this

defense, petitioner's counsel essentially conceded that petitioner intended to kill the victim,

arguing that "he actually feared for his life when he put those two holes in [the victim's] chest."

(Id. at 456.)  For his part, the prosecutor argued that petitioner intended to kill the victim even

before he entered the park.  (Answer, Ex. G at 478, 480, 487, 493.)  He pointed out that petitioner

shot the victim from a distance of only three to four feet, he aimed his gun at the victim's chest,

and he pulled the trigger twice.  (Id. at 480, 493.)  He argued that the evidence clearly

1  demonstrated an intent to kill.  (Id.)  Under these circumstances, the state court reasonably

2  concluded that the jury instruction requiring a finding of an intent to kill for voluntary

3  manslaughter or the failure to instruct the jury that they should render a verdict of manslaughter

4  if they harbored reasonable doubt as to whether murder or manslaughter had been committed

5  would not have had a significant impact on petitioner's defense.

6            The evidence presented at petitioner's trial also lent itself to a reasonable

7  inference that petitioner harbored intent to kill.  As noted by the California Court of Appeal,

8  petitioner admitted he deliberately shot the victim from close range, two shots hit the victim in

9  the chest, petitioner and Lentz immediately fled the scene of the crime, and petitioner

10 immediately disposed of the murder weapon.  Moreover, petitioner accompanied Lentz to the

11 park because she didn't want to walk through the park alone, carrying a pistol concealed under

12 his shirt.  (Answer, Ex. G at 223-24.)  After the shots were fired, petitioner did not call for aid,

13 but fired a gun at the victim's companions.  All of these factors lend reasonable support to the

14 conclusion of the state appellate court that the evidence introduced at trial suggested an intent to

15 kill and that petitioner's jury was not "confused into rejecting manslaughter on the basis of the

16 incorrect instruction that it was exclusively an intentional crime."  (Answer, Ex. B at 8.)

17            This court concludes that the California Court of Appeal was not objectively

18 unreasonable in determining that the erroneous jury instructions given at petitioner's trial were

19 harmless.  The state appellate court reasonably concluded that the factors outlined above

20 rendered harmless the trial court's error in failing to give a jury instruction defining manslaughter

21 and in erroneously instructing the jury that voluntary manslaughter required an intent to kill.  See

22 Messer v. Runnels, Civ. S- 03-0033 LKK KJM P, 2006 WL 657905, *5 (E.D. Cal. March 15,

23 2006 ) (petitioner's right to present a defense was not compromised by the court's failing to

24 instruct jurors correctly with respect to voluntary manslaughter under Lasko because petitioner's

25 only defense to the killing was that it was accidental); Shannon v. Newland, No. C 01-3275 MJJ,

26 2002 WL 31357690, *6  (N.D.Cal. Oct. 10 2002) (no prejudice where the trial court gave

1   CALJIC No. 8.50 instructing the jury that it could not convict the petitioner of murder unless the

2   prosecution proved he was not acting in the heat of passion beyond a reasonable doubt), aff'd on

3   other grounds 410 F.3d 1083 (9th Cir. 2005), cert. denied ___U.S.___, 126 S. Ct. 1333 (2006).

4   Accordingly, petitioner is not entitled to habeas relief on this claim.  Inthavong, 420 F.3d at

5   1059.

6              For the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's

7   application for a writ of habeas corpus be denied.

8              These findings and recommendations are submitted to the United States District

9   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

10  days after being served with these findings and recommendations, any party may file written

11  objections with the court and serve a copy on all parties.  Such a document should be captioned

12  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

13  shall be served and filed within ten days after service of the objections.  The parties are advised

14  that failure to file objections within the specified time may waive the right to appeal the District

15  Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

16  DATED: July 24, 2006.

17

18                                        _____

19                                        DALE A. DROZD
                                          UNITED STATES MAGISTRATE JUDGE
20  DAD:8:chapman501.hc

21

22

23

24

25

26